United States Court of Appeals
Fifth Circuit

**F I L E D**

**March 29, 2007**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 05-20592

_____

ARCHIE WATSON and
CYNTHIA WATSON

                                        Plaintiffs-Appellants,

versus

ALLSTATE TEXAS LLOYD'S

                                        Defendant-Appellee.


                -----------------------
        Appeal from the United States District Court
             for the Southern District of Texas
                      (4:03-CV-5805)
                -----------------------

Before GARWOOD, WIENER, and PRADO, Circuit Judges.

PER CURIAM*:

     Plaintiffs-Appellants  Archie  and  Cynthia  Watson  ("the
Watsons") sued Appellee Allstate Texas Lloyds Insurance Company
("Allstate") for breach of contract and other claims arising from
Allstate's denial of coverage for two claims made by the Watsons
under their property insurance policy ("the Policy").  Both parties
eventually moved for summary judgment.  The district court granted
Allstate's motion and denied the Watsons', who timely filed their
notice of appeal.

---

     * Pursuant to 5TH CIR. R. 47.5, the court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

## I.  FACTS & PROCEEDINGS

A house belonging to the Watsons is at the center of this insurance dispute.  They occupied it until July 1999, then used it as rental property.  Their first tenant, Antwanette Weaver, occupied the house until June 2000.  Weaver testified in her deposition that, during her occupancy, water leaked through the ceiling tiles during hard rains.  She also testified that she complained about these leaks to Mr. Watson on more than one occasion.  Mr. Watson testified that he investigated Weaver's reports but never found a leak or anything to indicate a leaking roof.

The Watsons did notice roof damage following Tropical Storm Allison, however, and they filed a claim for that in June 2001.  Allstate investigated the Watsons' post-hurricane claim and paid them for (1) water damage to the interior of the house resulting from the leaking roof and (2) the cost of emergency mitigation repairs that Watson claimed to have made to the roof.  Allstate's inspector denied the Watsons' claim for roof damage, however, after determining that the damage had been caused by a "non-covered Peril."  In a letter denying the claim, Allstate referenced two excluded perils, namely "(1) wear and tear, deterioration or loss caused by any quality in property that causes it to damage or destroy itself." and "(2) rust, rot, mold, or other fungi."

Allstate's final denial letter was dated October 9, 2001. The Watsons made no further repairs to the roof.

In August 2002, Mr. Watson discovered a leaking pipe behind a bathroom wall and reported that damage to Allstate. Allstate sent an adjuster and eventually paid the Watsons for the damage caused by that leak. While Allstate's adjuster was in the house inspecting that claim, part of a hallway ceiling collapsed. The adjuster went into the attic and determined that the roof was again leaking. The roof damage claim was reopened at the Watsons' request. Allstate again denied the Watsons' roof damage claim after determining that any worsening of the roof's condition was attributable to the Watsons' failure to repair the roof following Allstate's denial of their 2001 roof damage claim.

In November 2002, Mr. Watson reported various instances of mold damage in the house. After its adjuster inspected the property, Allstate retained a mold assessment company, Hometest, to survey the damage and locate possible moisture sources. Hometest identified several possible causes for the mold damage in the house, including (1) an active roof leak, (2) a plumbing leak under the slab, (3) condensation from voids in the air conditioning ductwork, (4) an active plumbing leak in a bathroom wall, and (5) a previously repaired plumbing leak in the kitchen.

Allstate then retained a leak detection and plumbing service company to identify and assess the extent of any under-slab plumbing leaks. The company detected four such leaks. Allstate

3

paid the Watsons to repair the leaking pipes under the slab, but withheld any payment for water and mold damage pending the findings of an engineering firm retained to determine more definitively the causes of that damage. The engineering firm determined that all of the mold and water damage to the house resulted from (1) in-wall plumbing leaks, (2) roof leaks, or (3) condensation resulting from the lack of a properly functioning moisture barrier under the slab. The firm excluded the under-slab plumbing leaks (as distinguished from condensation) as a cause of the interior damage.

Allstate notified the Watsons that their claim for mold and water damage purported to result from the under-slab leaks had been denied, because (1) the engineering report had ruled out the subsurface leaks as a cause, and (2) none of the other potential causes was a covered peril under the Policy. Allstate again referred to the Policy's exclusion for damages caused by "(1) wear and tear, deterioration or loss caused by any quality in property, (2) rust, rot, mold, or other fungi [or] dampness of atmosphere, extremes of temperature." The Watsons turned off water service to the property, but made no repairs.

In October 2003, the Watsons filed suit in state court, and Allstate removed the case to the district court. Allstate filed a motion for summary judgment, and the Watsons countered with their own motion for partial summary judgment in response to which Allstate filed a cross-motion for summary judgment. In resolving these motions, the district court decided that summary judgment in

4

favor of Allstate was warranted because (1) the Watsons failed to provide Allstate the contractually required "prompt notice" of the roof damage, (2)their action to recover for damage caused by roof leaks was time-barred, (3) they could not sustain their legal burden of showing that the Policy covered any of the mold or water damage that they claimed was caused by the under-slab plumbing leaks, and (4) dismissal of the Watsons' breach of contract claim effectively disposed of their non-contractual claims as well.

## II.  ANALYSIS

### A.  Standard of Review

We review the district court's grant of summary judgment de novo, and will affirm if, viewing the evidence in the light most favorable to the Watsons, the record reflects that no genuine issue of material fact exists and Allstate is entitled to judgment as a matter of law.[1]  Summary judgment is appropriate if a party who bears the burden of proof "fails to make a showing sufficient to establish the existence of an element essential to that party's case."[2]  For a defendant to obtain summary judgment on an affirmative defense, it must establish each of the defense's

---

[1] Fiess v. State Farm Lloyds, 392 F.3d 802, 807 (5th Cir. 2004).

[2] Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

5

essential elements beyond genuine dispute.[3] Summary judgment evidence must "rise to a level exceeding mere speculation."[4]

## B. Discussion

### 1. Mold Damage vs. Water Damage

Allstate suggests that the Texas Supreme Court's recent opinion in Fiess v. State Farm Lloyds[5] "is dispositive of the claims asserted by the Watsons in the [instant] suit." In Fiess, the Texas Supreme Court answered the following question certified to it by this court:

> Does the ensuing loss provision contained in Section I-Exclusions, part 1(f) of the Homeowners Form B (HO-B) insurance policy as prescribed by the Texas Department of Insurance effective July 8, 1992 (Revised January 1, 1996), when read in conjunction with the remainder of the policy, provide coverage for mold contamination caused by water damage that is otherwise covered under the policy?[6]

The Texas Supreme Court ruled that the ensuing loss provision of that form policy does not provide coverage for mold contamination resulting from water damage otherwise covered under the policy.

In this appeal, the Watsons concede that if we should remand their case to the district court, they will not be able to recover the costs of remediating the mold contamination that resulted from

---

[3] Bank of Louisiana v. Aetna U.S. Healthcare Inc., 468 F.3d 237, 241 (5th Cir. 2006).

[4] Fiess, 392 F.3d at 808 (citation omitted).

[5] 202 S.W.3d 744 (Tex. 2006).

[6] Fiess, 392 F.3d at 811-12.

6

water damage caused by the roof or plumbing leaks at issue in this case. They maintain, however, that they would still be entitled to recover for the water damage itself. To this extent, the Watsons are correct.

Allstate characterizes all of the physical damage at issue in this case as "mold damages," and the record does reflect that mold remediation comprises a significant, if not the predominant, portion of the repair costs that the Watsons face. It is beyond dispute, however, that Allstate denied coverage for <u>both</u> the mold <u>and</u> the water damage associated with the roof and under-slab leaks. For this reason, the Texas Supreme Court's decision in <u>Fiess</u> would affect only the quantum of the Watsons' recovery in the district court if they are successful on appeal, and does not dispose of their action entirely as Allstate contends.

**2. Breach of Contract**

**a. Generally**

In diversity cases such as this one, we apply state law rules of contractual construction. Therefore, Texas's rules of contract interpretation control.[7] Insurance policies are contracts and, as such, are controlled by rules that are applicable to contracts generally.[8] In Texas, the elements of a breach of contract claim

---

[7] See <u>Hamilton v. Seque Software Inc.</u>, 232 F.3d 473, 477 (5th Cir. 2000); <u>Erie R. Co. v. Tompkins</u>, 304 U.S. 64 (1938).

[8] <u>Barnett v. Aetna Life Ins. Co.</u>, 723 S.W.2d 663, 665 (Tex. 1987); <u>Amica Mut. Ins. Co. v. Moak</u>, 55 F.3d 1093, 1095 (5th Cir.

are: (1) the existence of a valid contract; (2) performance or tendered performance by one party; (3) nonperformance of the contract by the other party; and (4) damages incurred as a result.[9] If one party to a contract commits a material breach, the other party may be discharged or excused from any obligation to perform.[10] "In determining the materiality of a breach, courts will consider, among other things, the extent to which the nonbreaching party will be deprived of the benefit that it could have reasonably anticipated from full performance."[11]

### b.    The Roof Damage Claim(s)

The district court determined that the Watsons' breach of contract action, as it relates to Allstate's denial of the Watsons' June 2001 and August 2002 claims for roof damage, warranted dismissal on two grounds, viz., the Watsons failure to (1) provide Allstate "prompt notice" of their roof damage, and (2) file suit within the contractual limitations period. In granting Allstate's cross-motion for summary judgment, the district court devoted most of its discussion to the question of prompt notice and only briefly addressed limitations. The parties fully briefed the limitations

---

1995).

[9] _Acceptance Ins. Co. v. Lifecare Corp._, 89 S.W.3d 773, 782 (Tex. App.—Corpus Christi 2002, no pet.).

[10] _Hernandez v. Gulf Group Lloyds_, 875 S.W.2d 691, 692 (Tex. 1994).

[11] _Id._ at 693.

8

issue in their summary judgment pleadings, but the district court only noted conclusionally that "[the Watsons] cannot argue here that [their roof claim] was wrongfully denied because, pursuant to [their] policy, any action brought against [Allstate] must be brought within two years and one day after the action accrues." The court then observed in a footnote that "[the Watsons] wind/hail claim was denied on October 9, 2001 and [they] brought this case on December 23, 2003."

We review the district court's grant of summary judgment <u>de novo</u>, and may rest our ruling "on any basis raised below and supported by the record."[12] The record makes clear that the Watsons' breach of contract action, as it relates to their roof damage claim, is time-barred.

The Policy contained the following limitations provision:

> No suit or action can be brought unless the policy provisions have been complied with. <u>Action brought against us must be started within two years and one day after the cause of action accrues</u>.[13]

Texas courts routinely enforce such provisions in insurance policies.[14] It is well-settled that "[l]imitations begin to run on

---

[12] <u>Grenier v. Medical Engineering Corp.</u>, 243 F.3d 200, 207 (5th Cir. 2001).

[13] Emphasis added.

[14] <u>See, e.g</u>, <u>Mangine v. State Farm Lloyds</u>, 73 S.W.3d 467, 470-71 (Tex. App.—Dallas 2002, pet. denied); <u>Kuzniar v. State Farm Lloyds</u>, 52 S.W.3d 759, 760 (Tex. App.—San Antonio 2001, pet. denied); <u>Pena v. State Farm Lloyds</u>, 980 S.W.2d 949, 953 (Tex. App.—Corpus Christi 1998, no pet.).

an insurance policy when the loss is denied."[15]  In this case, Allstate sent two denial letters to the Watsons, one on July 12, 2001 and another on October 9, 2001.  Thus, the running of the contractual limitations period was triggered no later than October 9, 2001.  As the instant suit was filed in state court on October 29, 2003, the Watsons' breach of contract claim, based on Allstate's denial of their initial roof damage claim, is obviously time-barred.

In their response to Allstate's cross-motion for summary judgment,[16] however, the Watsons insisted that their action could not be time-barred, because it did not accrue until Allstate denied the Watsons' second roof claim in February 2003.  The Watsons' contention is founded on their erroneous belief that their second roof claim was a new claim, and not an attempt to reinstate their original roof damage claim.  That conclusion, in turn, is based on the fallacious contention that Allstate denied the first roof damage claim because it found no damage.  Not so: The record makes clear that, in July 2001, Allstate did in fact find roof damage; it merely denied coverage when it determined that this damage resulted from other than covered perils.  The record also makes clear that

---

[15] Pena, 980 S.W.2d at 953.

[16] The Watsons fail to brief the limitations issue on appeal, but as the district court's treatment of the issue was so brief, we will not treat their limitations argument as waived, but instead address the contentions they made in their summary judgment pleadings.

the Watsons made no repairs to their roof after their first claim was denied, despite reports from tenants that leaks continued. Finally, the record makes clear that Allstate denied the Watsons' 2002 roof damage claim because it determined that the damage was caused by the Watsons' failure either to (1) repair the roof or (2) timely notify Allstate of any putative new damage after their first claim was denied in 2001.

In sum, Allstate determined in 2001 that the Watsons' roof damage and its leaks were caused by conditions for which the Policy provided no coverage. The Watsons' damaged roof went unrepaired and continued to worsen until the ceiling partially collapsed in 2002. No other cause intervened that would provide the Watsons' coverage under the Policy. Consequently, instead of having opened a "new" claim in August 2002, the Watsons simply reinstated their previously denied roof damage claim, which Allstate again denied. Such a reinstatement does not re-start the limitations period for a breach of contract action.[17] As the Watsons' breach of contract

---

[17] See Pena, 980 S.W.2d 949 (Tex. App. 1998); Pace v. Travelers Lloyds of Texas Ins. Co., 162 S.W.3d 632 (Tex. App.—Houston 2005, no pet.). In Pena, the court held that "claims for additional payments may begin the statute of limitations running anew." 980 S.W.2d at 954. The limitations period was only reset, however, by the insurer's reconsideration of and partial payment for the earlier denied claim. Id. Even though Allstate honored its contractual duty to investigate the Watsons' second roof claim, the instant case more closely resembles Pace, in which the court held that a policy's limitation period is not reset when "there is no evidence that [a denial decision] was ever expressly or impliedly withdrawn or changed, such as by making payment or otherwise taking action inconsistent with that decision."

11

action based on Allstate's denial of their roof damage claim was filed after the contractual limitations period had expired, it is time-barred.

###    c.    Claim for Under-Slab Leaks

The district court also granted Allstate's motion for summary judgment on the Watsons' breach of contract action based on Allstate's denial of coverage for damage assertedly caused by under-slab plumbing leaks. The court concluded that, based on the pertinent summary judgment evidence, the Watsons could not show that the damage was of a kind covered by the Policy.

Under Texas law, an insured has the burden of showing that damage to its property is covered by an insurance policy.[18] If the insured bears his burden, the insurer has the burden of establishing that the cause of the damage is excluded under the policy.[19] And, if the insurer is successful, the insured again has the burden of showing that (1) the exclusion was improper or (2) an exception to the exclusion applies.[20]

###    i.    Proof of Covered Loss

The Watsons correctly note that, because their property policy was an "all perils" policy, they met their initial burden in this

---

[18] Fiess v. State Farm Lloyds, 392 F.3d 802, 807 (5th Cir. 2004).

[19] Id.

[20] Id.

case simply by showing that their property suffered physical damage. The Policy specifies that coverage exists for "all risks of physical loss to the property . . . unless the loss is excluded in General Exclusions."

## ii. Proof of Applicable Exclusion

In denying the Watsons' mold and water damage claim, Allstate referenced the Policy's general exclusion for loss caused by:

(1) Wear and tear, deterioration or loss by any quality in property,

(2) Rust, rot, mold or other fungi, or

(3) Dampness of atmosphere, extremes of temperature.

Allstate contends that the applicability of this exclusion is conclusively established by the report of the engineering firm that it retained to determine the causes of the damage to the Watsons' property. In that report, the engineers determined that the water and mold damage were likely "the result of long-term conditions, such as past roof leaks, lack of a properly functioning moisture barrier beneath the slab . . . surface water intrusion, and poor air conditioning operation/maintenance." Notably, damage from any of these likely causes is not covered under the Policy. The engineers also concluded that "current below-slab sanitary leaks can be excluded as a source of moisture causing damage to the subject wood floor."

13

### iii. Genuine Fact Issue

The district court determined that, as the Watsons neither undermined the veracity or the quality of the engineering report nor produced an expert opinion of their own, there was no genuine fact issue as to whether Allstate properly denied coverage. The Watsons contend nonetheless that, in making this determination, the district court improperly disregarded the conclusions reached by Hometest, the mold assessment company that initially inspected the property for Allstate. Hometest had speculated that under-slab leaks caused some of the damage in the house. The Watsons insist that Hometest's report creates a fact issue sufficient to defeat Allstate's summary judgment motion.

The district court acknowledged that facially Hometest's report appears to state that the under-slab plumbing leaks damaged particular rooms in the Watsons' house; but the court ultimately determined, based on testimony from the report's author, Ernest Pankonien, that "the intent of the [Hometest] report was to recommend to [Allstate] that they hire an expert to determine the cause of the damage." Specifically, the district court highlighted

> Pankonien's testimony that,based on the [] limited visual inspection and the sampling that was conducted [by Hometest], individuals and/or qualified firms with more experience and qualifications in structural and leak and cause origin determination analysis should be retained in order to more fully delineate what caused the mold and what needs to be done to correct the sources of moisture intrusion.

14

The district court concluded that, in light of this testimony, the Hometest report did not contradict the conclusion reached by the engineering firm that the under-slab leaks did not cause interior damage. Consequently, the court found the summary judgment record devoid of any evidence creating a genuine fact issue as to the applicability of the Policy's exclusion of coverage for the damage allegedly caused by the under-slab leaks.

We recognize that "the grant of a motion for summary judgment is often inappropriate where the evidence bearing on crucial issues of fact is in the form of expert opinion testimony."[21] Nevertheless, when a party opposing summary judgment fails to present evidence sufficient to make an issue of an expert's conclusions — such as contrary opinion evidence or evidence tending to undermine the expert's credibility or qualifications — and when "the trier of fact would not be at liberty to disregard arbitrarily the unequivocal, uncontradicted, and unimpeached testimony of an expert witness," expert testimony may form the basis of summary judgment.[22]

We agree with the district court that Pankonien's testimony makes clear that the Hometest report did not purport to establish with any certainty the actual causes of the water and mold damage

---

[21] See Webster v Offshore Food Service, Inc., 434 F.2d 1191, 1193 (5th Cir. 1970).

[22] Id. at 1193-94.

15

to the Watsons' property. Consequently, that report cannot be viewed as contradicting the conclusions of the engineering firm. Moreover, the trier of fact in this case would not be "at liberty to disregard arbitrarily" the report of a licensed structural engineering firm specializing in detecting the causes of water and mold damage. Of course, had Pankonien defended his report's findings more vigorously, this case could have presented the kind of "battle of the experts" that typically renders summary judgment presumptively inappropriate.

In light of Pankonien's testimony, however, no such "battle" took place in this case. The district court was presented with only (1) the Watsons' speculation —— not implausible but unsupported —— that the under-slab leaks caused interior mold and water damage, and (2) a specific expert opinion excluding the subsurface leaks as a cause of that damage. We are satisfied that the court did not err in concluding that, under these circumstances, no genuine issue of material fact existed as to whether the Watsons' damage is excluded from coverage.

### 3. Non-contractual Claims

In addition to breach of contract, the Watsons also sued Allstate for (1) breach of duty of good faith and fair dealing, (2) violation of the Texas Insurance Code, and (3) violation of the

16

Texas Deceptive Trade Practices Act. In rejecting all three, the district court reasoned that, because each of these non-contractual claims relies on a finding that the insurer has acted in bad faith, they fail. The Watsons are unable to show bad faith on the part of Allstate without making the predicate showing that it breached the insurance contract, and this the Watsons were unable to accomplish. Not only is the district court's reasoning on this issue sound,[23] but in addition, the Watsons have waived any challenge to this aspect of the district court's ruling by their failure to raise the issue on appeal.[24]

## III.  CONCLUSION

For the foregoing reasons, the district court's grant of Allstate's motion and cross-motion for summary judgment on all of the Watsons' claims, and the court's denial of the Watsons' summary judgment motion, are, in all respects,

AFFIRMED.

---

[23] See Republic Ins. Co. v. Stoker, 903 S.W.2d 338, 341 (Tex. 1995)("As a general rule there can be no claim for bad faith when an insurer has promptly denied a claim that is in fact not covered."); Liberty Nat. Fire Ins. Co. v. Akin, 927 S.W.2d 627, 629 (Tex. 1996)("[I]n most circumstances, an insured may not prevail on a bad faith claim without first showing that the insurer breached the contract.").

[24] See Fed. R. App. P. 28(a)(9)(A); Robinson v. Guarantee Trust Life Ins. Co., 389 F.3d 475, 481 n. 3 (5th Cir. 2004) ("Failure adequately to brief an issue on appeal constitutes waiver of that argument.").