

NUMBER 13-13-00046-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

USAA TEXAS LLOYD'S COMPANY,                                    Appellant,

v.

GAIL MENCHACA,                                                          Appellee.

### On appeal from the 9th District Court
### of Montgomery County, Texas.

# MEMORANDUM OPINION

### Before Justices Rodriguez, Garza and Benavides
### Memorandum Opinion by Justice Garza

This case involves a claim made by appellee, Gail Menchaca, on her homeowner's insurance policy with appellant, USAA Texas Lloyd's Company ("USAA"). A Montgomery County jury found that USAA did not breach the policy, but that it violated an insurance code provision by denying Menchaca's claim without conducting a reasonable investigation. The jury awarded $11,350 in damages as well as $130,000 in trial

attorney's fees to Menchaca. The trial court rendered judgment on the verdict and imposed an 18 percent penalty interest rate pursuant to the insurance code. *See* TEX. INS. CODE ANN. § 542.060 (West, Westlaw through 2013 3d C.S.). The final judgment additionally awarded conditional appellate attorney's fees to Menchaca. USAA challenges the judgment by five issues, arguing: (1) the trial court erred in disregarding the jury's finding that it did not breach the policy; (2) the trial court erred in awarding extra-contractual damages; (3) there was no evidence to support the jury's damages finding; (4) the award of attorney's fees and penalty interest should be reversed; and (5) Menchaca failed to segregate recoverable from non-recoverable attorney's fees. Menchaca raises one issue on cross-appeal. We affirm as modified.[1]

## I. BACKGROUND

Hurricane Ike, the costliest storm in Texas history,[2] struck the gulf coast in September 2008. About six weeks later, Menchaca noticed that some shingles on her roof were "billowing" and "lifting up and down," and she called USAA to make a claim under her homeowner's insurance policy. Menchaca testified that she informed USAA of the possible roof damage, "food damage" in her refrigerator due to prolonged loss of electricity, a detached electrical box, a broken sprinkler system, and a damaged fence. According to USAA, Menchaca expressed concern about her roof, electrical system, fence, and air conditioning units.[3]

---

[1] This appeal was transferred from the Ninth Court of Appeals to this Court pursuant to a docket equalization order issued by the Texas Supreme Court. *See* TEX. GOV'T CODE ANN. § 73.001 (West, Westlaw through 2013 3d C.S.).

[2] *See* Eric Berger, *Texas' list of 10 costliest storms tell us nothing of the real risk the state faces*, HOUS. CHRON. (June 11, 2009), http://blog.chron.com/sciguy/2009/06/texas-list-of-10-costliest-storms-tell-us-nothing-of-the-real-risk-the-state-faces (last visited July 23, 2014).

[3] A claim activity log produced at trial showed that USAA received a call from Menchaca on October

USAA assigned Darby Hambrick, an independent claims adjuster, to investigate Menchaca's claim. In early November of 2008, Hambrick inspected Menchaca's roof and found three missing ridge shingles on the front right gable which he thought might have been attributable to the storm, but he noticed no other loose or unsealed shingles. He also observed that the electrical box had been detached from the side of the house. He found no visible damage to the interior of the house or the air conditioning units, and he did not find any visible damage to the fence other than "normal wear and tear." Hambrick estimated the total repair cost at $700, comprising $455 to replace the missing shingles and $245 to reattach the electrical box. However, the deductible under the policy was $2,020. Accordingly, USAA sent Menchaca a letter on December 9, 2008, explaining that this type of loss is covered under her policy, but that USAA owed no payment because the repairs for the damage identified by Hambrick did not exceed the deductible.

At some point, USAA assigned one of its employees, field adjuster David Glover, to conduct a re-inspection of the house. Glover found no impact damage nor any torn, creased, or bent-back shingles. He did find "a few" unsealed shingles on the roof, but he concluded that this was not caused by the storm.[4] According to Glover, Menchaca reported no damage to the interior nor did she mention anything about damage to the fence.

---

28, 2008. The log entry stated: "there is some [damage] to shingles are missing or [damaged] [sic]; a/c is working but would like looked at; commode has low water level; power line has yanked line away from home; [Menchaca] would like to have [USAA] adjuster to handle."

[4] Glover explained that a strip of sealant is located on the top surface of the shingle which is supposed to adhere to the underside of the overlapping shingle. Glover concluded that the unsealed shingles he observed had never been sealed because, if they were sealed and then pulled loose by the wind, the sealant strips would have been damaged. But the sealant strips on the unsealed shingles he observed were not damaged. Moreover, he did not find any sealant on the underside of the overlapping shingles.

Menchaca filed suit against USAA on June 22, 2009, alleging breach of the policy, fraud, and various violations of the insurance code.[5]  *See id.* § 541.151 (West, Westlaw through 2013 3d C.S.) (establishing a private cause of action based on an "unfair method of competition or an unfair or deceptive act or practice in the business of insurance" as defined in the insurance and business and commerce codes).  Menchaca requested treble damages, exemplary damages, attorney's fees, and penalty interest.[6]

At trial, USAA stipulated to the reasonableness of an estimate of electrical repairs prepared by Menchaca's electrician, John Moore, totaling more than $3,300.  As to the other alleged storm damages, the parties each relied on expert testimony.  One of Menchaca's experts, engineer Greg Becker, testified that he inspected the house and concluded that the entire roof needed to be replaced.  He testified that the "lifted shingles" were "caused by wind."  He stated that, according to official weather data, the wind speed at Menchaca's home at the time of the storm "was 80 to 85 sustained miles per hour and 99 to 103 gust, 3-second gust."  When asked whether all the shingles had been sealed prior to the storm, Becker stated:  "I have to make a judgment of that in the field, and I do believe they were sealed."  Becker elaborated:

> I would say that the shingles were sealed because there was adhesive on the shingles.  We're in a hot climate.  They were good shingles.  There wasn't any adhesive missing.  They were laying flat.  They were well installed, and that's my judgment that supports that they were sealed before they were lifted.

---

[5] Menchaca also sued Hambrick, but later non-suited her claims against him.  Hambrick is not a party to this appeal.

[6] A notice letter sent by Menchaca's counsel to USAA, a copy of which was attached to Menchaca's petition, demanded $1,245,355.25 in economic damages, $50,000 in mental anguish damages, and $481,785.08 for "expenses" including attorney's fees.

4

In addition to the "lifted shingles" on "most of the roof" and the detached electrical box, Becker also found "separations on the exterior," "[s]ome small separations in brick," "[s]ome trim separations," a "[s]mall piece of damaged gutter in the back," damage to "[s]ome individual segments of fencing in the rear yard," and a "gate that was not working as part of the fence and front-left side." In the interior, Becker found "some water damage," "rafter separation," and a "ceiling crack." Becker testified that this damage was "hurricane damage" and that "we rule out . . . non-hurricane damage."

Another expert witness, Darrell Quinney, testified that he inspected the roof in June of 2009 and estimated the repair costs to be $29,600, entailing full replacement of the roof. He stated that "[t]he visible damage that I saw to the roof was very significant. Significant enough to warrant replacement without even checking to see if the shingles had been lifted." Quinney testified:

> There were numerous impact damages to every slope. . . . I mean there were torn shingles. There were holes in shingles. There were ripped shingles. There were numerous damages that told me or made me firmly believe that the roof was impacted in several places by the blowing debris of the storm.

Quinney further estimated fence repair costs at $4,700 and electrical box reattachment costs at $251. Quinney later re-inspected the house in May 2010 and recalculated the roof repair estimate to be approximately $22,000.[7] The total estimate for repairs to Menchaca's house in the May 2010 estimate was $38,439. In January of 2011, Quinney prepared a third estimate, based on another inspection as well as a report authored by

---

[7] Quinney stated that the figure had been reduced because, initially, he "suspect[ed] there to be some decking damage below the shingles" and therefore "included 25 percent replacement of the deck" in his original estimate. He stated, "when I prepared estimate number two, I took those worst case scenarios out."

Becker. The third estimate included approximately $24,000 for repairs to the interior damage identified by Becker, as well as repairs to exterior siding and trim which had not been previously included. The total repair cost quoted in Quinney's January 2011 estimate was $76,348. Quinney testified that this amount is reasonable.

USAA's expert, civil engineer Mark Kubena, examined Menchaca's roof and stated that the unsealed shingles showed no sign of wind damage. He testified that the natural expansion and contraction of shingles due to temperature changes may, over the course of many years, cause shingles to become unsealed. According to Kubena, though many shingles were unsealed, they were not cracked or creased as would be expected if they had been lifted by hurricane-force wind. Kubena further stated that the shingles were rated to withstand winds of 90 to 110 miles per hour, but that the top wind speed at the height of the roof during Hurricane Ike was only, in his opinion, approximately 82 miles per hour.[8] Another expert, Ronald Simmons, an electrical engineer, testified on USAA's behalf that the electrical box needed to be reattached to the side of the house but that there was no other damage to the house's electrical system.

Hambrick testified that his initial inspection of Menchaca's house lasted forty-five minutes. He reiterated his inspection findings at trial. Hambrick denied that Menchaca reported "food damage" or any concerns other than those she originally reported to USAA. He stated that, if Menchaca had reported food spoilage, he would have included that in the estimate. When counsel told Hambrick that Menchaca previously testified that

---

[8] Kubena stated that the "three-second gust" wind speed, according to weather data, was at most 103 miles per hour. However, Kubena explained that this figure must be corrected because it is measured by anemometers located at a height of ten meters and in an "Exposure C category," or open terrain. Menchaca's house was located in an "Exposure B category" terrain—that is, among "surrounding obstructions such as trees and buildings and things of that nature"—and was less than ten meters in height. Therefore, Kubena reduced the "three-second gust" wind speed by approximately 20 percent.

6

she told him that she had a food loss, but that Hambrick told her that it was below her deductible, Hambrick replied: "That would be a bad thing to say because food loss doesn't apply to that [deductible]. That's a separate entity, separate set of coverages. It has nothing to do with wind claim or anything else. It's a separate coverage that USAA extends to their members for general power outages."

The case was submitted to the jury. Question number one of the jury charge asked if USAA "fail[ed] to comply with the terms of the insurance policy with respect to the claim for damages made by [Menchaca] resulting from Hurricane Ike."[9] The jury answered "no." Question number two asked whether USAA "engage[d] in any unfair or deceptive act or practice that caused damages" to Menchaca. The question was accompanied by an instruction defining "unfair or deceptive act or practice" as "any one or more of the following":

---

[9] The insurance policy contained the following section entitled "Appraisal":

If you and we do not agree on the amount of loss, either party can demand that the amount of the loss be determined by appraisal. If either makes a written demand for appraisal, each will select a competent, independent appraiser and notify the other of the appraiser's identity within 20 days of receipt of the written demand.

The two appraisers will then select a competent, impartial umpire. If the two appraisers are not able to agree upon the umpire within 15 days, you and we can ask a judge of a court of record in the state where the residence premises is located to select an umpire.

The appraisers will then set the amount of loss. If they submit a written report of any agreement to us, the amount agreed upon will be the amount of loss. If they fail to agree within a reasonable time, they will submit their differences to the umpire. Written agreement signed by any two of these three will set the amount of the loss. Each appraiser will be paid by the party selecting that appraiser. Other expenses of the appraisal and the compensation of the umpire will be equally paid by you and us.

"[A]n appraisal award made pursuant to an insurance policy is binding and enforceable unless the insured proves that the award was unauthorized or the result of fraud, accident, or mistake." *Toonen v. United Servs. Auto. Ass'n*, 935 S.W.2d 937, 940 (Tex. App.—San Antonio 1996, no writ). However, despite the fact that Menchaca and USAA clearly disagreed on the amount of loss, it does not appear that either party attempted to invoke this section by making a written demand for appraisal.

A. Failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim when the liability under the insurance policy issued to [Menchaca] had become reasonably clear; or

B. Failing to promptly provide to [Menchaca] a reasonable explanation of the factual and legal basis in the policy for the denial of a claim(s); or

C. Failing to affirm or deny coverage within a reasonable time; or

D. Refusing to pay a claim without conducting a reasonable investigation with respect to a claim(s); or

E. Misrepresenting to [Menchaca] a material fact or policy provision relating to the coverage at issue.

*See id.* § 541.060(a)(1), (a)(2)(A), (a)(3), (a)(4)(A), (a)(7)(A) (West, Westlaw through 2013 3d C.S.). The jury answered "yes" to part D but "no" to the remaining parts of question number two.[10]

Question number three[11] asked the jury:

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Gail Menchaca for her damages, if any, that resulted from the failure to comply you found in response to Question number 1 and/or that were caused by an unfair or deceptive act that you found in response to Question number 2[?]

The question included an instruction stating that "[t]he sum of money to be awarded is the difference, if any, between the amount USAA should have paid [Menchaca] for her Hurricane Ike damages and the amount that was actually paid." The jury answered, "$11,350.00." The jury further found that Menchaca could not have avoided her damages

---

[10] In response to question number four, the jury found that USAA did not "engage in . . . such conduct knowingly," thereby precluding Menchaca's recovery of treble damages under the insurance code. *See* TEX. INS. CODE ANN. § 541.152(b) (West, Westlaw through 2013 3d C.S.) ("[O]n a finding by the trier of fact that the defendant knowingly committed the act complained of, the trier of fact may award an amount not to exceed three times the amount of actual damages.").

[11] The jury was instructed to answer this question if it answered "yes" to question number one or any part of question number two, or both.

8

"through the exercise of reasonable care in protecting the property from further damage or making reasonable and necessary repairs."

Finally, the jury was asked in question number six to assess "a reasonable fee for the necessary services of [Menchaca]'s attorneys in this case." The jury found that $130,000 was reasonable "[f]or representation in the trial court" but answered "No" with respect to appellate attorney's fees.

After the jury returned its verdict, USAA moved for entry of judgment in its favor on the basis that, "when no breach of contract is found, there can be no bad faith or extra-contractual liability as a matter of law." USAA argued that, because the jury found no breach of contract, Menchaca could not recover on her extra-contractual claims. USAA further argued in its motion that there is no evidence that any failure to investigate caused damage to Menchaca. In her own motion for entry of judgment, Menchaca asserted that the jury's "no" answer to question number one should be disregarded because it is immaterial. Instead, Menchaca argued that judgment in her favor is mandated by the jury's findings as to questions two and three. Menchaca further asked that the jury's award of zero appellate attorney's fees be disregarded because it is supported by no evidence.

In its final judgment, the trial court granted Menchaca's request to disregard the jury's answers as to the breach of contract[12] and appellate attorney's fees questions. The

---

[12] At the hearing on the parties' motions for entry of judgment, the trial court explicitly stated that it intended to "ignore" the jury's answer to question number one. In doing so, it gave the following explanation:

> [The jury] looked at the electrical work that was done, the other damages, the fence, the other things that came up during the trial. And they gave a value to that. I think that's what they did. And I think they believed that the adjuster failed to give a reasonable inspection, failed to make a—was just in a hurry, made a pit stop, said you don't qualify, and he left. And I think they thought that was unreasonable behavior. That's the way they answered the question, the way the question was drawn. So the real question is whether or not that

9

final judgment awarded $164,371, including past damages, 5% prejudgment interest and 18% penalty interest on the damages award, as well as trial attorney's fees and court costs. The final judgment also awarded conditional appellate attorney's fees of $5,000 for court of appeals proceedings, and $10,000 for Texas Supreme Court proceedings. USAA filed a motion for new trial which was denied, and this appeal followed.

## II. DISCUSSION

### A. Extra-Contractual Claims

By its second issue, USAA argues that, because the jury found no breach of contract, Menchaca's extra-contractual claims must fail as a matter of law. In support of this issue, USAA relies primarily on the Texas Supreme Court's opinion in *State Farm Lloyds v. Page*, 315 S.W.3d 525 (Tex. 2010). In that case, the plaintiff homeowner sued her insurer, contending that the insurer failed to pay for covered mold damage caused by plumbing leaks. *Id.* at 527. The Court held that the policy at issue provided coverage for mold damage to personal property but not for mold damage to the dwelling itself. *Id.* at 530–31. Summary judgment in favor of the insurer was therefore improper with respect

---

failure to say breach of contract in question number one, does that just end the whole case? I mean, by saying no—but look at the question again. It says, "Breach of contract," but it doesn't say what kind of breach. It doesn't even explain breach of contract. It doesn't even give a definition for breach of contract. There's all kinds of other things that should have been put in there about what's material breach, definition of material breach. The question fails altogether. It shouldn't have been submitted in the first place. If you remember correctly, I didn't want that question submitted. But it was insisted upon by the plaintiffs, so they've got to reap what they sow. But I think that I can easily ignore question number one as being incomprehensible to a layman and that it has no effect. I can go with what I wanted to go with in the first place which was question number two, damage question, then attorney's fees. That's what I'm going to do. I'm going to ignore question number one entirely because I think it was poorly worded. It did not have adequate definitions with it to aid the jurors. I think its response is meaningless. So it's a small judgment victory for the plaintiffs. I think it's a victory for the insurance company because USAA is vindicated about the shingles. And that just because the shingles got blown up and came back down again doesn't mean you get a new roof. I think that's what the jury said. So in a way you won as well as a small victory for the plaintiffs.

10

to the plaintiff's claim for mold damage to personal property but proper with respect to the plaintiff's claim for mold damage to her dwelling. *Id.* Crucially for our purposes, in addition to her breach of contract claim, the plaintiff also brought extra-contractual claims including violations of the insurance code. *Id.* at 527, 532. The Court noted that, "[w]hen the issue of coverage is resolved in the insurer's favor, extra-contractual claims do not survive." *Id.* at 532 (citing *Progressive Cnty. Mut. Ins. Co. v. Boyd*, 177 S.W.3d 919, 922 (Tex. 2005) ("There can be no liability under article 21.55 if the insurance claim is not covered by the policy.")). The Court stated that "[t]here can be no liability under either Article 21.55 or Article 21.21 of the Insurance Code[] if there is no coverage under the policy" but that, "to the extent the policy affords coverage, extra-contractual claims remain viable." *Id.* The Court therefore held that, to the extent the plaintiff's extra-contractual claims are based on the insurer's denial of coverage for mold damage to her dwelling, they cannot survive. *Id.* But to the extent the plaintiff's extra-contractual claims were based on denial of her claims for mold damage to her personal property, those claims were remanded to the trial court for further proceedings. *Id.*

USAA argues on appeal that the jury's answer to question number one is tantamount to a finding that the insurance policy at issue did not cover the damages to Menchaca's property, and that under *Page*, this finding of no coverage precluded recovery under any extra-contractual theory.

We disagree for two reasons. First, a claim based on the particular insurance code provision which the jury found USAA violated in this case is arguably not barred by a finding of no coverage. That provision, section 541.060 of the insurance code, is not among those mentioned by the Court in *Page*, and for good reason. The statutes

11

mentioned in *Page* deal with prompt payment of claims. *See id.*[13]; TEX. INS. CODE ANN. §§ 542.051–.061, 543.001, 551.001–.454 (West, Westlaw through 2013 3d C.S.). Extra-contractual claims based on these statutes are naturally precluded when there is a finding of no coverage—after all, it would be absurd to allow a plaintiff to recover damages on the basis that the insurer failed to promptly pay a claim if the claim was not covered by the policy in the first place. On the other hand, section 541.060 deals with unfair settlement practices, and in particular, subsection (a)(7) of section 541.060 deals with reasonable investigations. There appears to be nothing in the insurance policy itself requiring USAA either (1) to conduct a reasonable investigation prior to denying a claim, or (2) to cover all damages that would be identified by a reasonable investigation.[14] Subsection (a)(7) of section 541.060 thus imposes a duty on an insurer, above and beyond the duties established by the insurance policy itself, to conduct a reasonable investigation prior to denying a claim. It follows that USAA could have fully complied with the contract even if it failed to reasonably investigate Menchaca's claim.[15]

---

[13] As noted, the *Page* Court held that "[t]here can be no liability under either Article 21.55 or Article 21.21 of the Insurance Code if there is no coverage under the policy." *State Farm Lloyds v. Page*, 315 S.W.3d 525, 532 (Tex. 2010). The Court noted that article 21.55 has since been repealed and recodified as sections 542.051 through .061 of the insurance code, while article 21.21 has been repealed and recodified as sections 551.001 through .454 and section 543.001 of the insurance code. *Id.* at 532 n.3.

[14] The policy merely states that "[i]n return for payment of premium and subject to all terms of this policy, we will provide the insurance described" and that "[w]e insure against risks of direct, physical loss to property described in Coverages A and B," with certain exceptions not applicable here. "Coverages A and B" include "the dwelling on the residence premises . . . , including structures attached to the dwelling" and "other structures on the residence premises set apart from the dwelling by clear space."

[15] As USAA acknowledges in its reply brief:

[T]he policy did not obligate USAA to perform an investigation. The requirement that an insurer conduct a reasonable investigation is imposed by the Insurance Code. . . . Thus, the jury's finding that a statutory failure to investigate was breached does not establish that USAA failed to comply with the terms of the policy.

Second, even if USAA is correct that a claim based on an insurer's failure to conduct a reasonable investigation is barred when there is a finding of no coverage, the jury's answer to question number one does not definitively establish that there was no coverage. The parties do not dispute that Menchaca's policy generally covered damages to her property caused by Hurricane Ike. The disagreement here does not involve the extent of coverage afforded under the policy; rather, it is about the precise amount of damages inflicted by the storm on the covered property. Further, as the trial court noted when it declared its intention to disregard the finding of no breach, question number one did not define breach of contract or otherwise instruct the jury on how to answer the question. It merely asked the jury whether USAA failed to comply with the policy.[16] The jury could have found that USAA did not fail to comply with the policy for any one of several reasons: for example, it could have found that USAA was required under the policy only to pay for damages which it subjectively believed according to its own inspection were caused by the storm, and that USAA complied with that requirement because the damages identified by Hambrick and Glover amounted to less than the deductible. We do not presume to know the jury's thoughts when it considered question

---

[16] The trial court denied USAA's request for the following instructions to accompany question number one:

> You are instructed that the policy requires a "direct, physical loss" to exist before any coverage applies.

> You are instructed the policy excludes wear and tear, latent defects, and vermin, rodents, and insects.

> You are instructed the Insured[']s duties after a loss include: (a) give prompt notice of any claim, (b) protect the property from further damages, and (c) make reasonable and necessary repairs to protect the property.

USAA does not argue on appeal that the trial court erred by rejecting this instruction.

number one; we merely observe that its negative answer to that question is not equivalent, as USAA asserts on appeal, to a finding that "there is no coverage for the alleged damage to the roof, house, and fence."

For the foregoing reasons, we find *Page* distinguishable and conclude that Menchaca's extra-contractual claims were not barred as a result of the jury's finding that USAA did not fail to comply with the policy. USAA's second issue is overruled.

## B.    Motion to Disregard Contract Verdict

By its first issue, USAA argues that the trial court erred in disregarding the jury's finding that it did not breach the policy.

### 1.    Applicable Law and Standard of Review

After the jury returns its verdict, if there is no irreconcilable conflict in the jury's findings, the trial court is generally under a duty to render a judgment that conforms to that verdict. TEX. R. CIV. P. 301; *see Cantu v. Hidalgo Cnty.*, 398 S.W.3d 824, 827 (Tex. App.—Corpus Christi 2012, pet. denied). When determining whether jury findings irreconcilably conflict, we apply a de novo standard of review. *Indian Beach Prop. Owners' Ass'n v. Linden*, 222 S.W.3d 682, 695 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (citing *Bender v. S. Pac. Transp. Co.*, 600 S.W.2d 257, 260 (Tex. 1980)). The threshold question is whether the findings are about the same material fact. *Arvizu v. Estate of Puckett*, 364 S.W.3d 273, 276 (Tex. 2012) (citing *Bender*, 600 S.W.2d at 260). When the findings do address the same material fact, they irreconcilably conflict only if "one of the answers would require a judgment in favor of the plaintiff and the other would require a judgment in favor of the defendant." *Id.* (quoting *Little Rock Furniture Mfg. Co. v. Dunn*, 222 S.W.2d 985, 991 (Tex. 1949)); *see Waltrip v. Bilbon Corp.*, 38 S.W.3d 873,

14

877 (Tex. App.—Beaumont 2001, pet. denied) ("A conflicting jury finding will not prevent the rendition of judgment and require a mistrial unless the findings, considered separately and taken as true, would compel the rendition of different judgments."). We have a "duty to harmonize jury findings when possible" and we "must uphold jury findings if there is any reasonably possible basis upon which they may be reconciled." *Arvizu*, 364 S.W.3d at 276.

When there is no irreconcilable conflict, a trial court may nevertheless disregard a jury finding if (1) the finding is immaterial or (2) there is no evidence to support one or more of the jury findings on issues necessary to liability. *See* TEX. R. CIV. P. 301; *Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex. 1994); *Cantu*, 398 S.W.3d at 827. A finding is "immaterial" when the corresponding question either: (1) should not have been submitted; (2) calls for a finding beyond the province of the jury, such as a question of law; or (3) was properly submitted but has been rendered immaterial by other findings. *Se. Pipe Line Co., Inc. v. Tichacek*, 997 S.W.2d 166, 172 (Tex. 1999); *Spencer*, 876 S.W.2d at 157; *Cantu*, 398 S.W.3d at 827.

### 2. Analysis

The jury's answers to questions one and two of the jury charge are not in irreconcilable conflict because, considered separately and taken as true, they do not compel the rendition of different judgments. *See Waltrip*, 38 S.W.3d at 877. As we have already held, the jury's conclusion that USAA did not fail to comply with the contract is not inherently inconsistent with its conclusion that USAA violated its statutory obligation to conduct a reasonable investigation. The trial court therefore could not have permissibly

15

disregarded the answer to question number one on the basis that it irreconcilably conflicted with the answer to question number two.

However, the trial court's decision was justified on another basis. As noted, the jury was instructed in question number three to assess the same damages—precisely defined as the difference between the amount USAA should have paid to Menchaca for storm damages and the amount it did pay—if it found *either* a breach of contract under question number one *or* a violation of the insurance code under question number two, or both. USAA did not object to this instruction, nor did it ask for an instruction directing the jury not to answer the insurance code or damages questions if it found no breach of contract.[17] The jury's finding that USAA committed a violation of the insurance code rendered the no-breach-of-contract finding immaterial because the charge instructed the jury to award the same damages regardless of which theory of liability was adopted. And, we have already concluded that the finding of no breach did not preclude Menchaca's statutory claim that USAA failed to conduct a reasonable investigation. Because the jury's answer to question number one was rendered immaterial, the trial court did not err in disregarding it. *See Tichacek*, 997 S.W.2d at 172. USAA's first issue is overruled.

## C.    Evidence of Damages

By its third issue, USAA contends that there was no evidence to support the jury's damages award. We will sustain a "no evidence" or legal sufficiency challenge only if: (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by rules

---

[17] Accordingly, to the extent USAA's issue may be construed as a challenge to the jury charge, that issue has been waived. *See* TEX. R. CIV. P. 272 (noting that objections to the jury charge must be "presented to the court in writing" or "dictated to the court reporter in the presence of the court and opposing counsel" and that "[a]ll objections not so presented shall be considered as waived").

16

of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller*, 168 S.W.3d at 822. In evaluating legal sufficiency, we consider the evidence in the light most favorable to the verdict and indulge every reasonable inference that would support it. *Id.*

USAA argues specifically that "[a]n insured is not entitled to recover extra-contractual damages unless the complained of actions or omissions cause injury independent of the injury resulting from a wrongful denial of policy benefits." *United Servs. Auto. Ass'n v. Gordon*, 103 S.W.3d 436, 442 (Tex. App.—San Antonio 2002, no pet.) (citing *Parkans Int'l L.L.C. v. Zurich Ins. Co.*, 299 F.3d 514, 519 (5th Cir. 2002); *Provident Am. Ins. Co. v. Castañeda*, 988 S.W.2d 189, 198–99 (Tex. 1998); *MacIntire v. Armed Forces Benefit Ass'n*, 27 S.W.3d 85, 92 (Tex. App.—San Antonio 2000, no pet.)).

An allegation that an insurer failed to perform a reasonable investigation is a type of bad faith claim. *See Twin City Fire Ins. Co. v. Davis*, 904 S.W.2d 663, 666 n.3 (Tex. 1995). A bad faith claim is not a claim for breach of contract; rather, it is based on a tort duty imposed by law. *Chitsey v. Nat'l Lloyds Ins. Co.*, 738 S.W.2d 641, 643 n.1 (Tex. 1987). However, in most circumstances, an insured may not prevail on a bad faith claim without first showing that the insurer breached the contract. *Liberty Nat'l Fire Ins. Co. v. Akin*, 927 S.W.2d 627, 629 (Tex. 1996); *Republic Ins. Co. v. Stoker*, 903 S.W.2d 338, 341 (Tex. 1995); *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 17 (Tex. 1994). USAA cites several cases where an insured's extra-contractual claims were barred as a matter of law because there was no evidence of damages other than wrongfully withheld policy benefits. *See Watson v. Allstate Tex. Lloyd's*, 224 F. Appx. 335, 342–43 (5th Cir. 2007);

17

*Parkans*, 299 F.3d at 519; *Mag-Dolphus v. Ohio Cas. Ins. Co.*, 906 F. Supp. 2d 642, 649 (S.D. Tex. 2012); *Castañeda*, 988 S.W.2d at 198–99; *Fire Ins. Exch. v. Sullivan*, 192 S.W.3d 99, 108 (Tex. App.—Houston [14th Dist.] 2006, pet. denied); *Lundstrom v. United Servs. Auto. Ass'n*, 192 S.W.3d 78, 96 (Tex. App.—Houston [14th Dist.] 2006, pet. denied); *Gordon*, 103 S.W.3d at 442; *MacIntire*, 27 S.W.3d at 92; *Toonen v. United Servs. Auto. Ass'n*, 935 S.W.2d 937, 941 (Tex. App.—San Antonio 1996, no writ).

We find these cases distinguishable. Most of them involve situations where the policy at issue was explicitly found not to cover the category of damages claimed by the plaintiff. *See Watson*, 224 F. Appx. at 342 ("[N]o genuine issue of material fact existed as to whether the [plaintiffs'] damage is excluded from coverage."); *Parkans*, 299 F.3d at 519 ("finding no coverage under the primary policy"); *Sullivan*, 192 S.W.3d at 108 (finding that plaintiffs' extra-contractual claims regarding personal property damage were barred because the jury found no coverage for personal property damage under the policy); *Lundstrom*, 192 S.W.3d at 96 (concluding that plaintiff's extra-contractual claims regarding mold damage were barred because the policy "did not cover mold damage under the facts alleged here").

In *Gordon*, USAA denied the plaintiffs' claim because it determined that seasonal weather changes, rather than plumbing leaks, caused the complained-of foundation damage. *Gordon*, 103 S.W.3d at 437–38. The plaintiffs sued for breach of contract, violations of the insurance code, breach of the duty of good faith and fair dealing, and engaging in unconscionable conduct. *Id.* at 438. The jury found in favor of the plaintiffs on all of their claims, and it awarded identical amounts of damages under both the contractual and extra-contractual theories of recovery. *Id.* at 442. The Texas Supreme

18

Court held that USAA "cannot, as a matter of law, be liable for the extra[-]contractual claims" because the plaintiffs failed to prove any damages apart from those "stemming from the denial of the claim." *Id.* The Court therefore affirmed the award of contractual damages and reversed the award of extra-contractual damages. *Id.* *Gordon* is distinguishable from the instant case, however, because the jury in that case already found that USAA had breached the insurance policy and the judgment awarded damages for that breach. *See id.* In *Gordon*, an award of extra-contractual damages—where the only damages in evidence "stemm[ed] from the denial of the claim"—would have constituted an impermissible double recovery. *See id.*; *see also Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 390 (Tex. 2000) ("Under the one satisfaction rule, a plaintiff is entitled to only one recovery for any damages suffered."). Such circumstances are not present in this case.

In *Castañeda*, the Texas Supreme Court cited *Republic Insurance Co. v. Stoker*, 903 S.W.2d 338, 339 (Tex. 1995), for the proposition "that failure to properly investigate a claim is not a basis for obtaining policy benefits." *Castañeda*, 988 S.W.2d at 198. In *Stoker*, the supreme court considered "whether an insurer breaches its duty of good faith and fair dealing to its insured if it denies a claim for an invalid reason when there was at the time a valid reason for denial." 903 S.W.2d at 339. There, the trial court rendered judgment on the plaintiffs' extra-contractual claims despite the fact that summary judgment had already been rendered in favor of the insurer on the issue of contractual liability under the policy. *Id.* The supreme court held that this was error in light of the "general rule" that "there can be no claim for bad faith when an insurer has promptly denied a claim that is in fact not covered" and because it was "established" that the policy

19

at issue did not cover the claimed damages. *Id.* at 340–41. Here, on the other hand, it was not "established" that the policy provided no coverage for Menchaca's claim. Indeed, as noted, USAA did not dispute that the policy covered windstorm damage to Menchaca's property. The jury found USAA complied with the insurance policy, but as we have already discussed, this could have been for reasons other than lack of coverage. We believe that this case, therefore, constitutes an exception to the "general rule" that breach of the policy must be established before policy benefits may be recovered. *See Akin*, 927 S.W.2d at 629; *Stoker*, 903 S.W.2d at 340–41.[18]

In any event, USAA has not directed us to any cases, nor can we find any, involving a situation such as this one where (1) the insurer complied with the policy, but (2) nonetheless violated the insurance code, and (3) the insurer *would have been* contractually obligated to pay policy benefits had the insurer complied with the insurance code. *Cf. MacIntire*, 27 S.W.3d at 92 (breach of contract claim was properly disposed of by summary judgment because plaintiffs did not timely pay policy premium, and extra-contractual claims were based only on billing errors and denial of benefits under the policy). Under the unique circumstances presented in this case, USAA did not breach the policy but policy benefits are indeed the correct measure of damages caused by USAA's violation of the insurance code. *See* TEX. INS. CODE ANN. § 541.152(a)(1) (West, Westlaw through 2013 3d C.S.) ("A plaintiff who prevails in an action under this

---

[18] The *Stoker* Court distinguished *Deese v. State Farm*, 838 P.2d 1265, 1266–67 (Ariz. 1992), on the basis that the insurance company in *Deese* "did not deny coverage"'; rather, "[t]he dispute was whether portions of the medical bills were not reasonable and therefore not compensable." *Republic Ins. Co. v. Stoker*, 903 S.W.2d 338, 341 n.1 (Tex. 1995). We believe this case is similar to *Deese*. USAA did not deny that the policy covered damages caused to Menchaca's home by Hurricane Ike; rather, the dispute concerned the amount of loss suffered as a result of the storm. Therefore, the instant case is not subject to the "general rule" that policy benefits may not be awarded as damages for extra-contractual claims when there is no breach of contract finding.

20

subchapter may obtain . . . the amount of actual damages . . . ."); *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 816 (Tex. 1997) ("Actual damages are those damages recoverable under common law"); *Vail v. Tex. Farm Bureau Mut. Ins. Co.*, 754 S.W.2d 129, 136 (Tex. 1988) ("[A]n insurer's unfair refusal to pay the insured's claim causes damages as a matter of law in at least the amount of the policy benefits wrongfully withheld."). We therefore overrule USAA's third issue.

## D.    Penalty Interest

USAA contends by its fourth issue that the award of penalty interest should be reversed because the jury found no liability under the insurance policy. We agree. The applicable statute provides:

> If an insurer that is liable for a claim under an insurance policy is not in compliance with this subchapter, the insurer is liable to pay the holder of the policy or the beneficiary making the claim under the policy, in addition to the amount of the claim, interest on the amount of the claim at the rate of 18 percent a year as damages, together with reasonable attorney's fees.

TEX. INS. CODE ANN. § 542.060(a). The jury in this case did not find USAA liable for "a claim under an insurance policy" since its verdict of damages was based on USAA's violation of the insurance code, not a breach of the policy. *See id.*

Even if we were to construe the verdict as holding USAA liable for "a claim under an insurance policy," the jury did not find that USAA failed to comply with any provision of subchapter B of chapter 542 of the insurance code. *See id.* §§ 542.051–.061 (West, Westlaw through 2013 3d C.S.) (subchapter B of chapter 542, entitled "Prompt Payment of Claims"). Instead, the jury found USAA liable only for refusing to pay a claim without conducting a reasonable investigation with respect to the claim. *See id.* § 541.060(a)(7). Refusing to pay a claim without conducting a reasonable investigation is not one of the

21

enumerated requirements of subchapter B of chapter 542. *See id.* §§ 542.051–.061. Accordingly, there was no basis for the trial court to have awarded penalty interest. We sustain this part of USAA's fourth issue and modify the judgment to delete the 18 percent penalty interest award.

## E.    Attorney's Fees

### 1.    Basis for Award

USAA further argues by its fourth issue that the trial court's award of attorney's fees should be reversed because the jury found no breach of contract. We disagree. Under the insurance code, a "plaintiff who prevails in an action under [subchapter D of chapter 541] may obtain," among other things, "reasonable and necessary attorney's fees." *Id.* § 541.152(a)(1). Although the jury found that USAA did not fail to comply with the insurance policy, it did find that USAA violated the insurance code, and we have already determined that the two findings do not irreconcilably conflict. Because Menchaca's suit was properly brought under subchapter D of insurance code chapter 541, *see id.* § 541.151 (establishing a private right of action for damages caused by, among other things, "an unfair or deceptive act or practice in the business of insurance"), and because she prevailed in her suit, she was entitled to recover reasonable attorney's fees. We overrule this part of USAA's fourth issue.

### 2.    Segregation of Fees

By its fifth and final issue, USAA contends that the attorney's fees award was improper because Menchaca failed to segregate recoverable from unrecoverable fees. "[I]f any attorney's fees relate solely to a claim for which such fees are unrecoverable, a claimant must segregate recoverable from unrecoverable fees." *Tony Gullo Motors I, L.P.*

22

*v. Chapa*, 212 S.W.3d 299, 313 (Tex. 2006). An exception to this rule applies when recoverable and non-recoverable claims "are so intertwined that they need not be segregated." *Id.*; *see A.G. Edwards & Sons, Inc. v. Beyer*, 235 S.W.3d 704, 710 (Tex. 2007) ("It is only when legal services advance both recoverable and unrecoverable claims that the services are so intertwined that the associated fees need not be segregated.").

USAA asserts that Menchaca's contractual claim (as to which attorney's fees were not recoverable because Menchaca did not prevail thereon) and her insurance code claim (as to which fees were recoverable as set forth above) were not "so intertwined" such that segregation was unnecessary. USAA argues that Menchaca's contract claim was "based on whether the damage to her home was caused by Hurricane Ike and was covered by policy," whereas her insurance code claim was "based on whether USAA conducted a reasonable investigation of her claim." It cites *United States Insurance Fire Co. v. Millard*, a 1993 case in which the First District Court of Appeals held that the plaintiffs' contractual and extra-contractual insurance claims were "separate and distinct" and therefore properly severed from each other. 847 S.W.2d 668, 672 (Tex. App.—Houston [1st Dist.] 1993, orig. proceeding) (stating generally that "[a] breach of an insurance contract claim is separate and distinct from bad faith, Insurance Code or DTPA causes of action").

We disagree that Menchaca was required to segregate fees attributable to her contract claim from fees attributable to her insurance code claim. The two claims relied upon the same underlying factual allegations and both sought recovery of policy benefits as damages. Because the "legal services advance[d] both recoverable and unrecoverable claims," *Beyer*, 235 S.W.3d at 710, we conclude that the claims were "so

23

intertwined" such that segregation was not feasible or necessary. *See Tony Gullo Motors*, 212 S.W.3d at 313. USAA's fifth issue is overruled.

### 3. Appellate Fees

By one issue on cross-appeal, Menchaca argues that the award of appellate fees was improper because it was less than the amount that her trial attorney, Randal Cashiola, testified was reasonable. Cashiola testified that a reasonable amount of conditional appellate attorney's fees would be $50,000 for proceedings in the court of appeals and $25,000 for proceedings in the Texas Supreme Court. As noted, the jury awarded no appellate fees, but the trial court granted Menchaca's motion to disregard that finding. The final judgment awarded fees of $5,000 and $10,000 for proceedings in the court of appeals and in the supreme court, respectively.

"[W]here trial counsel's testimony concerning attorney's fees is clear, positive and direct, and uncontroverted, it is taken as true as a matter of law" and "in such instances, appellate courts will reverse a denial or minimization of attorney's fees and render judgment for attorney's fees in the amount proved." *McMillin v. State Farm Lloyds*, 180 S.W.3d 183, 210 (Tex. App.—Austin 2005, pet. denied) (citing *Ragsdale v. Progressive Voters League*, 801 S.W.2d 880, 882 (Tex. 1990) ("[W]here the testimony of an interested witness is not contradicted by any other witness, or attendant circumstances, and the same is clear, direct and positive, and free from contradiction, inaccuracies, and circumstances tending to cast suspicion thereon, it is taken as true, as a matter of law.")). "Ordinarily, the allowance of attorney's fees rests with the sound discretion of the trial court and will not be reversed without a showing of abuse of that discretion." *Ragsdale*, 801 S.W.2d at 881.

Menchaca asserts that the trial court was compelled to accept Cashiola's testimony regarding the reasonable amount of appellate fees because such testimony was uncontroverted by USAA. We disagree. Even if evidence is uncontroverted, "if it is unreasonable, incredible, or its belief is questionable, then such evidence would only raise a fact issue to be determined by the trier of fact." *Id.* at 882. Here, Menchaca's attorney testified that he derived his estimate of reasonable fees based upon an hourly rate of $500. However, he conceded that a State Bar of Texas survey showed that the median hourly rate for attorneys in southeast Texas is $194, less than half of the billed rate.[19] From this testimony, the trial court could have concluded that a reasonable amount of appellate fees was less than the amount that Cashiola testified was reasonable. *See id.* (noting that, even if fee testimony is uncontroverted, "the trial judge could find some of the claimed fees to be unreasonable, unwarranted, or some other circumstance which would make an award of the uncontroverted claim wrong"); *see also Clinica Santa Maria v. Martinez*, No. 13-09-573-CV, 2010 WL 2543943, at *4 (Tex. App.—Corpus Christi June 24, 2010, pet. denied) (mem. op.) ("[E]ven if there is no direct testimony to contradict the amount testified to, a trial court still has the discretion to award a lesser amount if it has any reason to determine that the award was unreasonable or unwarranted."). We conclude that the trial court did not abuse its discretion in this regard. Menchaca's issue on cross-appeal is overruled.

---

[19] USAA's counsel sought to admit a copy of the State Bar survey into evidence, but Menchaca objected and the trial court sustained the objection. There was no objection made, however, to Cashiola's testimony regarding the State Bar survey.

### III. CONCLUSION

We affirm the trial court's judgment as modified herein.  *See* TEX. R. APP. P. 43.2(b).

DORI CONTRERAS GARZA,
Justice

Delivered and filed the
31st day of July, 2014.